324 S.E.2d 713

**WEST VIRGINIA CITIZENS ACTION GROUP, INC., and Scott Walker**

v.

**Edwin C. DALEY, City Manager of Fairmont, West Virginia; Wayne Stutler, Chief of Police of Fairmont, West Virginia; and, Gregory T. Hinton, Mayor of Fairmont, West Virginia.**

**No. 16396.**

Supreme Court of Appeals of West Virginia.

Dec. 21, 1984.

McGRAW, Justice:

The petitioners in this mandamus proceeding, the West Virginia Citizens Action Group, Inc., a nonprofit corporation dedicated to the advocacy of consumer and citizen issues before various governmental entities, and Scott Walker, its director of canvassing for northern West Virginia, challenge the constitutionality of Fairmont ordinance 711.12, governing the issuance of solicitation permits, which provides, in pertinent part, that "The effective hours of the charitable solicitation permit shall be between 9:00 a.m. and sunset. Solicitations shall be prohibited during other hours," based upon the free speech doctrines of vagueness and overbreadth. Prior to our analysis of this ordinance under these doctrines, we will address the appropriateness of mandamus and the constitutional status of the petitioners' activities under the federal and state constitutions.

I

■ The criteria for the award of extraordinary relief by writ of mandamus are well established in this jurisdiction. "A writ of mandamus will not issue unless three elements coexist—(1) a clear right in the petitioner to the relief sought; (2) a clear legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969); *see also Allen v. Human Rights Commission*, 174 W.Va. 139, 324 S.E.2d 99 at 105 (1984), and cases cited therein; *Reed v. Hansbarger*, 173 W.Va. 258, 314 S.E.2d 616, 619–20 (1984), and cases cited therein.

The respondents in the instant proceeding, Fairmont city manager, Edwin C. Daley; Fairmont police chief, Wayne Stutler; and Fairmont mayor, Gregory T. Hinton, pose a curious challenge to the fulfillment of the first two elements of the mandamus formula. They contend that the ordinance in question is only "hortatory" or "advisory;" that it merely "admonishes citizens not to solicit after dark;" and that it "neither penalizes the petitioners nor denies

Robert M. Bastress, Morgantown, for petitioners.

George R. Higinbotham, City Atty., Fairmont, for respondents.

them their right to solicit in hours deemed inappropriate." Although the respondents recognize the petitioners' constitutional right to canvass or solicit after "sunset," they maintain that they "have no duty to petitioners to sanction their activities in hours they deem inappropriate." As evidence of this lack of impingement upon the exercise of the petitioners' free speech rights, the respondents note that the petitioners' application for a charitable solicitation permit was approved despite the notation upon such application that, "We will canvass during the hours of 4 to 9 p.m." Apparently, the respondents contend that this constitutes a waiver of any sanctions for violations of the ordinance by the petitioners.

■ There are several obvious flaws in the respondents' argument that no impairment of the petitioners' activities results from this ordinance. First, the language of the ordinance is not "hortatory," but is clearly mandatory. Second, under section 5 of the ordinance, "if any permit holder ... has violated any of the terms of the permit or has otherwise violated the provisions of this ordinance, then it shall be the duty of the City Clerk to revoke the permit...." Third, section 101.99 of the Fairmont City Code, a "general penalty" provision, states that, "Whenever ... in any ordinance ... any act is prohibited ... where no specific penalty is otherwise provided, whoever violates any such provision shall be fined not more than five hundred dollars ($500.00) or imprisoned not more than thirty days, or both." Finally, the petitioners state that the respondents and their agents have indicated that the city and its police force intend to fully enforce this ordinance, contrary to what the respondents now maintain. Therefore, particularly given the inherent chilling effect of the Fairmont ordinance, we reject the respondents' contention that the absence of attempted enforcement precludes our examination of the issue of constitutionality.

■ The petitioners also contend that adequate alternative remedies exist which preclude the award of extraordinary relief; namely, appeal from any criminal conviction for violation of the ordinance or injunctive relief in circuit court. As this Court stated, however, in Syllabus Point 5 of *Hardin v. Foglesong*, 117 W.Va. 544, 186 S.E. 308 (1936), "Mandamus will not be denied on the ground that there is another remedy unless such other remedy is equally convenient, beneficial, and effective." *See also Allen v. Human Rights Commission, supra* at 106, and cases cited therein. Similarly, in *Walls v. Miller*, 162 W.Va. 563, 566, 251 S.E.2d 491, 495 (1978), this Court stated, "The trend in this Court has been to enlarge the scope of mandamus, *State ex rel. Smoleski v. County Court of Hancock County*, 153 W.Va. 307, 168 S.E.2d 521 (1969), especially where there is an urgent question of public policy or where there is no reason for delaying adjudication of the issue by the highest court of the State." (Footnote omitted). This Court has consistently held that mandamus may be used to attack the constitutionality or validity of a statute or ordinance. *See, e.g., Daily Gazette Co. v. Committee on Legal Ethics*, 174 W.Va. 359 at 361, 326 S.E.2d 705 at 707–708 n. 2 (1984); *Bailey v. Truby*, 174 W.Va. 8, 321 S.E.2d 302, 307 (1984); *Myers v. Barte*, 167 W.Va. 194, 279 S.E.2d 406, 408–09 (1981); *State ex rel. McCamic v. McCoy*, 166 W.Va. 572, 276 S.E.2d 534, 535, 539 n. 6 (1981); *State ex rel. West Virginia Housing Development Fund v. Copenhaver*, 153 W.Va. 636, 638, 171 S.E.2d 545, 547 (1969); *State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479, 481, 153 S.E.2d 284, 285 (1967); *State ex rel. Sheldon v. City of Wheeling*, 146 W.Va. 691, 695, 122 S.E.2d 427, 429 (1961); *see also State ex rel. Ammerman v. City of Philippi*, 136 W.Va. 120, 65 S.E.2d 713 (1951); *State ex rel. Tucker v. City of Wheeling*, 128 W.Va. 47, 35 S.E.2d 681 (1945); *Austin v. Thomas*, 96 W.Va. 628, 123 S.E. 590 (1924). Therefore, we reject the respondent's contention that mandamus is precluded in the instant proceeding by the existence of adequate alternative remedies.

## II

Following a line of cases beginning with the United States Supreme Court's seminal

decision in *Schneider v. State,* 308 U.S. 147, 165, 60 S.Ct. 146, 152, 84 L.Ed. 155, 167 (1939), reversing the conviction of a Jehovah's Witness who was convicted for violating an ordinance which required canvassers and solicitors to obtain a written permit from the chief of police who possessed practically unbridled discretion in awarding such permits, and ending with the Court's most recent decision in *Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 969–970, 104 S.Ct. 2839, 2854, 81 L.Ed.2d 786, 804 (1984), invalidating a Maryland statute prohibiting the solicitation of contributions by charitable organizations whose expenses exceeded 25 percent of the amount received through such fund-raising activities, substantial first amendment protection has been granted door-to-door canvassing and soliciting activities. *See also Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Village of Shaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *Follett v. Town of McCormick,* 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); *Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Largent v. Texas,* 318 U.S. 418, 63 S.Ct. 667, 87 L.Ed. 873 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

In *Schneider,* 308 U.S. at 164, 60 S.Ct. at 152, 84 L.Ed. at 166, the Court noted the importance of door-to-door expressive activities: "[P]amphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people." Similarly, in *Martin,* 319 U.S. at 145–46, 63 S.Ct. at 864–65, 87 L.Ed. at 1318, the Court noted the rich tradition of door-to-door activity in this country:

Many of our most widely established religious organizations have used this method of disseminating their doctrines, and laboring groups have used it in recruiting their members. The federal government, in its current war bond selling campaign, encourages groups of citizens to distribute advertisements and circulars from house to house. Of course, as every person acquainted with political life knows, door to door campaigning is one of the most accepted techniques of seeking popular support, while the circulation of nominating papers would be greatly handicapped if they could not be taken to the citizens in their homes. Door to door distribution of circulars is essential to the poorly financed causes of little people.

In order to finance these "causes of little people," the Court recognized the critical interrelationship between canvassing and solicitation in *Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833–34, 63 L.Ed.2d at 84, stating that:

Prior authorities ... clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease. Canvassers in such contexts are necessarily more than solicitors for money.

This need to accommodate the solicitation of financial support by those advancing the "causes of little people" is particularly pronounced given the protection granted corporations, which possess large accumulations of capital at their disposal to magnify

the volume of expression designed to serve their own impersonal social, political, and economic interests, in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). *See also Anderson's Paving, Inc. v. Hayes*, 170 W.Va. 640, 295 S.E.2d 805 (1982).

■ Finally, we note that the types of advocacy in which the petitioners engage are at the core of the interests protected by constitutional free speech guarantees. As the Court stated in *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964), "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Similarly, in *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484, 488 (1966), the Court stated, "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *In New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964), the Court noted that, "[D]ebate on public issues should be uninhibited, robust, and wide-open." Finally, in *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506 (1957), the Court recognized that, "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *See also First National Bank of Boston, supra; Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The purpose of the petitioners' activities is to serve as both a catalyst and a conduit for the expression of the needs and desires of the public with respect to their governmental institutions.

■ Although protected by constitutional free speech guarantees, door-to-door canvassing and solicitation are subject to reasonable time, place, and manner restrictions which narrowly serve legitimate governmental interests. In *Hynes*, 425 U.S. at 619, 96 S.Ct. at 1760, 48 L.Ed.2d at 252, the Court identified two legitimate governmental interests which support the regulation of door-to-door canvassing and solicitation activities:

> There is, of course, no absolute right under the Federal Constitution to enter on the private premises of another and knock on a door for any purpose, and the police power permits reasonable regulation for public safety. We cannot say ... that door-to-door canvassing and solicitation are immune from regulation under the State's police power, whether the purpose of the regulation is to protect from danger or to protect the peaceful enjoyment of the home.

As to the governmental interest in crime prevention served by the regulation of door-to-door canvassing and solicitation, the Court stated in *Martin*, 319 U.S. at 144, 63 S.Ct. at 864, 87 L.Ed. at 1317, that, "[B]urglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later. Crime prevention may thus be the purpose of regulatory ordinances." As to the governmental interest in the protection of privacy in the home, the Court stated in *Martin*, 319 U.S. at 144, 63 S.Ct. at 864, 87 L.Ed. at 1317, that, "Constant callers, whether selling pots or distributing leaflets, may lessen the peaceful enjoyment of a home as much as a neighborhood glue factory or railroad yard which zoning ordinances may prohibit." *See also Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263, 276 (1980); *FCC v. Pacifica Foundation*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073, 1093 (1978); *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736, 742 (1970); *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247–48, 22 L.Ed.2d 542, 549 (1969); *Breard v. City of Alexandria*, 341 U.S. 622, 644, 71 S.Ct. 920, 933, 95 L.Ed. 1233, 1249 (1951). Additionally, in *Cantwell*, 310 U.S. at 306, 60 S.Ct. at 904, 84 L.Ed. at 1219, the Court identified a third justification for the regulation of door-to-door canvassing and solicitation: "Without doubt a State may protect its

citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." *See also Joseph H. Munson Co.,* 467 U.S. at 961, 104 S.Ct. at 2849, 81 L.Ed.2d at 798; *Schaumburg,* 444 U.S. at 637, 100 S.Ct. at 836, 63 L.Ed.2d at 87–88. Of course, any regulation designed to serve these legitimate governmental interests must be drawn with both clarity and specificity in order to pass constitutional muster.

## III

■ We must first examine the Fairmont ordinance in light of the petitioners' contention that it is unconstitutionally vague. Recently, in *Garcelon v. Rutledge,* 173 W.Va. 572, 318 S.E.2d 622, 625 (1984), this Court discussed the application of the vagueness doctrine in the free speech context:

A doctrine which has emerged as a tool for protecting the exercise of expression and association rights has evolved from a fundamental principle of procedural due process. As a matter of basic procedural due process, a law is void on its face if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926); *see also Gooden v. Board of Appeals of the West Virginia Department of Public Safety,* 160 W.Va. 318, 323, 234 S.E.2d 893, 896 (1977); *State v. Flinn,* 158 W.Va. 111, 117, 208 S.E.2d 538, 542 (1974). There are primarily two reasons for this rule. First, "[v]ague laws may trap the innocent by not providing a fair warning." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222, 227 (1972). Second, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2299, 33 L.Ed.2d at 227, *see also Papachristou v. City of Jacksonville,* 405 U.S. 156, 170,

92 S.Ct. 839, 847, 31 L.Ed.2d 110, 120 (1972).

Although both of these concerns are equally applicable to the regulation of expression and association, an additional consideration is raised in the free speech context which creates a heightened need for specificity. Because ambiguity in the regulation of speech may inhibit citizens from fully exercising their fundamental constitutional rights by causing them to " 'steer far wider of the unlawful zone,' *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, 1473 (1958), than if the boundaries of the forbidden areas were clearly marked," *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377, 385 (1964), the vagueness doctrine "demands a greater degree of specificity" in the free speech context than in other contexts. *See Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605, 612 (1974); *see also Ashton v. Kentucky,* 384 U.S. 195, 200–01, 86 S.Ct. 1407, 1410, 16 L.Ed.2d 469, 472–73 (1966); *Cantwell v. Connecticut,* 310 U.S. 296, 311, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 1221 (1940). Similarly, as the United States Supreme Court stated in *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963): "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." To minimize the potential "chilling effect" of regulations governing the exercise of rights guaranteed under constitutional free speech provisions, those regulations must be both narrowly and clearly drawn.

■ The fundamental flaw in the Fairmont ordinance is its failure to define the term "sunset." The lack of clarity with regard to this inherently ambiguous term raises the spectre of both chilling effect and discriminatory enforcement. In addressing proposed prosecutions under regulations promulgated under the Migratory Bird Treaty Act, which permitted the hunting of migratory game birds "to sunset," the court in *In re Informations Under*

*Migratory Bird Treaty Act*, 281 F. 546, 549 (D.Mont.1922), noted:

> In behalf of the average hunter, in a spirit of fairness and practicality, to serve the object of protection to birds as they settle for repose in darkness, and to escape otherwise unavoidable and inadvertent violations of the regulation, it is believed "to sunset" means, not the moment of solar sunset, which can be determined nohow and nowhere, save by scientific calculations in a few great observatories, but means the time when, in the circumstances and in the honest judgment from observation of the hunter, or from the best information available to him, it appears that sunset occurs. Otherwise, "to sunset" is absolutely indeterminable as a practical matter in the field, and otherwise there will be an intolerable number of accidental offenses by conscientious and law-abiding sportsmen.

Similarly, in *People v. Town of Bishop*, 111 Ill. 124, 135 (1884), the court noted the imprecision of the term "sunset":

> "[S]un set," although a definite period of time at any given locality, yet what that time is can only be known from scientific calculations, which very few persons are capable of making. It is not precisely the same on any two days in succession, nor is it exactly the same at any two points distance apart in the State on the same day. It is known the sun sets later at a point west than one further east, and of this fact the court may take judicial notice. The exact difference of time, however, can only be ascertained by a mathematical calculation.

This imprecision was interpreted by the court in *Town of Bishop*, 111 Ill. at 135–36, to grant considerable discretion to those governmental officials charged with implementing the constitutional provision in question:

> Certainly the framers of the schedule to the constitution never expected the judges of election at the several voting places in the entire State would ascertain with mathematical precision the hour of "sun set," that they might close the polls at that precise instant. It is believed the term "sun set" was not used by the framers of that instrument in any accurate sense, to be determined by calculation. Evidently all that was meant was that the polls should be kept open until it should appear to be "sun set," as that fact might be ascertained by the judges from observation, or from the best information attainable. Nor was it expected the judges at the several voting places throughout the State would observe the hour of "sun set" with exact accuracy. The hour of "sun set" on any given day, as it might appear to different persons, could hardly be expected to be accurately observed. Their judgment might vary many minutes. One person might conclude the sun had set, and another might not think so. It would be a mere matter of judgment, and uncertain at that, aided by the most accurate information ordinarily possessed.

A fine line drawn through dusk is too slender a thread upon which to hang the exercise of fundamental free speech rights.

## IV

In addition to the need for clarity in the time, place and manner regulation of door-to-door canvassing and solicitation, constitutional free speech guarantees also mandate specificity with respect to such regulation. The scope of governmental regulation of protected first amendment activity designed to serve a substantial governmental interest must be "no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680 (1968). With respect to temporal restrictions on door-to-door canvassing and solicitation, we note that the majority of courts have held that regulations which fail to permit some evening activity are not sufficiently tailored to serve the governmental interests advanced for such restrictions and are therefore unconstitutionally overbroad.

In *Association of Community Organizations for Reform Now v. City of Frontenac*, 714 F.2d 813, 818 (8th Cir. 1983), the Eighth Circuit reversed a judgment upholding the constitutionality of or-

dinance which prohibited solicitation between the hours of 6:00 p.m. and 9:00 a.m., stating that:

> Although we find that Frontenac's asserted objectives are legitimate, we hold that the regulation in issue here is not sufficiently tailored so as to avoid conflict with the plaintiff's first amendment freedoms. Since constitutional principles require that the regulation be narrowly drawn to further the legitimate governmental objective, the proponent of the regulation must demonstrate that the government's objectives will not be served sufficiently by means less restrictive of first amendment freedoms. *E.g., Schad v. Borough of Mount Ephraim,* 452 U.S. [61] at 70–72, 101 S.Ct. [2176] at 2183–84 [68 L.Ed.2d 671]; *Village of Schaumberg,* 444 U.S. at 637–38, 100 S.Ct. at 836; *Thomas v. Collins,* 323 U.S. at 539–40, 65 S.Ct. at 326–27; *Martin v. City of Struthers,* 319 U.S. 141, 148, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943); *Schneider v. State,* 308 U.S. at 164, 60 S.Ct. at 152. In this case, there is no showing that any of several less restrictive alternatives would not meet the government's objectives.

As noted above, Frontenac has a legitimate interest in protecting its residents from crime. This objective can be served satisfactorily by enforcement of the city's application and identification requirements for all canvassers, peddlers, and solicitors. In addition, trespassing, fraud, burglary, or any other offense against a resident or his property may be prohibited and the violator punished under existing penal laws.

Similarly, the city may achieve its goal of preventing undue annoyance of its residents through means less restrictive of constitutional freedoms than the means embodied in this regulation. The city's trespassing laws may be enforced against those who enter or remain on private property after its owner has indicated the intruder is not welcome. Furthermore, unlike the public transit patron in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion); *id.* at 307–08, 94 S.Ct. at 2719 (Douglas, J., concurring), and the unwilling target of the sound truck in *Kovacs v. Cooper,* 336 U.S. [77] at 86–87, 69 S.Ct. [448] at 453 [93 L.Ed. 513], the resident in this case is not a member of a captive audience. The solicitor or canvasser has no right to make an uninvited entry into a resident's home. *Cf. Rowan v. United States Post Office Department,* 397 U.S. 728, 736–38, 90 S.Ct. 1484, 1490–91, 25 L.Ed.2d 736 (1970) (householder has right to bar entry of unwanted mail into home). If the resident is not interested in receiving the particular solicitor's message, he may indicate as much and close the door. If the resident cares not to receive messages from any solicitors or canvassers, he may post a sign to that effect at his door or at the entrance to his property. But Frontenac may not, in the interest of achieving its legitimate objectives, broadly prohibit the plaintiff's activities when less restrictive alternatives will satisfactorily accomplish the same objectives. As the Supreme Court held in *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963): "Broad prophylactic rules in the area of free expression are suspect.... Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Id.* at 438, 83 S.Ct. at 340.

We are not persuaded by Frontenac's argument that the ordinance is valid since it allows ACORN and others to solicit at alternative times, namely, from 9:00 a.m. to 6:00 p.m., Monday through Saturday. Regardless of ACORN's argument that to canvass during those hours would be fruitless, we note, as the Supreme Court has noted, that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. at 163, 60 S.Ct. at 151. *See also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757 n. 15, 96 S.Ct. 1817, 1823 n. 15, 48 L.Ed.2d 346 (1976); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239,

1245, 43 L.Ed.2d 448 (1975); *Citizens for a Better Environment v. Village of Olympia Fields,* 511 F.Supp. at 107–08. The issue in this case deals with the validity of Frontenac's prohibition of solicitation after 6:00 p.m. on weekdays, not with the efficacy of solicitation at some other time. (Footnotes omitted). See also *Pennsylvania Public Interest Coalition v. York Township,* 569 F.Supp. 1398, 1402–03 (M.D.Pa.1983) (invalidating ordinance banning home solicitation between the hours of 6:00 p.m. and 9:00 a.m.); *Citizens for a Better Environment v. Village of Olympia Fields,* 511 F.Supp. 104, 106–08 (N.D.Ill.1980) (invalidating various ordinances which restricted canvassing and solicitation to the hours of 9:00 a.m. to some hour between 4:00 p.m. to 6:00 p.m. or until "sunset"); *Connecticut Citizens Action Group v. Town of Southington,* 508 F.Supp. 43, 45–47 (D.Conn.1980) (invalidating ordinance which restricted canvassing and solicitation to the hours of 8:00 a.m. to 6:00 p.m.); *Citizens for a Better Environment v. Village of Elm Grove,* 462 F.Supp. 820, 824 (E.D.Wis.1978) (issuing preliminary injunction enjoining village from enforcing ordinance against the plaintiffs from 9:00 a.m. to 9:00 p.m. on any two consecutive weekdays); *Alternatives for California Women, Inc. v. County of Contra Costa,* 145 Cal.App.3d 436, 449–51, 193 Cal.Rptr. 384, 392–93 (Cal.Ct.App.1983) (invalidating county ordinance which prohibited solicitation between "sunset and sunrise").

Conversely, in *Pennsylvania Alliance for Jobs and Energy v. Council of Borough of Munhall,* 743 F.2d 182, 185–88 (3d Cir.1984), the Third Circuit, in a 2–1 decision, upheld the validation of various ordinances restricting door-to-door canvassing and solicitation to between the hours of 9:00 a.m. and 5:00 p.m. Monday through Saturday, stating:

These ordinances' prohibition of door-to-door canvassing after daylight hours is intimately linked to the towns' interests in preventing crime. The district court found that each of the towns established a significant incidence of burglary and home invasion. That unregulated canvassing poses a risk of crime is well known: "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." *Martin v. City of Struthers,* 319 U.S. 141, 146, 63 S.Ct. 862, 864, 87 L.Ed. 1313 (1943). Indeed, the record in this case indicates that at least one of the towns has had experience with canvassers being involved in burglary and other crime. *See* App. at 358a–60a. The local authorities' task of detecting and preventing burglary would clearly be more difficult if strangers to their communities were permitted to roam from house to house after dark. The bans of door-to-door canvassing after dark directly and precisely serve the towns' interest in preventing crime.

The prohibitions of canvassing after 5:00 P.M. also directly further the towns' interest in protecting the privacy of their residents. "Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuit, is surely an important value." *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980). This value is clearly promoted by regulations that protect persons from the annoyance of coping with uninvited solicitors at the dinner hour and in the evening.

We hold, therefore, that the time-of-day restrictions in these ordinances are precisely tailored to serve the towns' substantial interests in preventing crime and protecting the privacy of their residents.

743 F.2d at 187. *See also Westfall v. Board of Commissioners,* 477 F.Supp. 862, 865–66 (N.D.Ga.1979) (upholding ordinance limiting door-to-door canvassing and solicitation to between the hours of 9:00 a.m. to 6:00 p.m.); *McMurdie v. Doutt,* 468 F.Supp. 766, 776 (N.D.Ohio 1979) (approving restriction of solicitation to between the hours of 9:00 a.m. to 6:00 p.m. without discussion).

The dissenting opinion in *Pennsylvania Alliance*, 743 F.2d at 189, however, found none of the justifications given by the majority sufficient to sustain the constitutionality of the challenged ordinances. First, as to the crime prevention justification, the dissent noted that there was no evidence which supported the majority's conclusions concerning criminal activity related to door-to-door canvassing and solicitation after dark. 743 F.2d at 190. In fact, the dissent mentioned that the one incident, in which someone posing as a Bible salesman was seen breaking into a house, advanced in support of the correlation between after dark solicitation, and criminal activity, "occurred at noontime," and not after dark. 743 F.2d at 190 n. 3. The dissent also remarked, "As the Supreme Court has stated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731, 739 (1969), 'in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the rights to freedom of expression.' ... We live in a dangerous age, to be sure, but safety stripped of the freedom to enjoy its fruits becomes a sad form of solitude." 743 F.2d at 190. Second, as to the privacy justification, the dissent conceded, "Few would quarrel ... with an ordinance that barred all door-to-door solicitation at three o'clock in the morning." 743 F.2d at 191. He also noted, however, that "[i]t is unclear at what time the privacy interests that would lead us to sustain that type of ordinance begin to outweigh the first amendment interests of those who desire to solicit in the evening hours...." 743 F.2d at 191. The dissent offered that, "I might well, for example, find an ordinance that barred all solicitation after 9 p.m. to be justified by such privacy interests." 743 F.2d at 191. As to the majority's conclusion that ample alternative channels of communication are available which support the validity of the challenged ordinances, the dissent stated:

[D]oor-to-door solicitation is clearly a unique form of communication in our democracy, one for which few substitutes exist, particularly among those unable to buy their way into the home through purchase of radio or television time or direct mail. When out on the street, the solicitor confronts individuals who are generally engaged in the commerce of the day and unwilling to exchange in any prolonged discussion. Moreover, away from one's "home turf," the average individual may often feel threatened by a stranger coming at him or her and promoting unusual ideas. The public park has similar deficiencies, and is often a poor site for engaging individuals in one-on-one discussions of the ideas of the day. Today's private shopping mall may bar solicitors, *see Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), and, again, because those in it are generally busy, provides an avenue of communication with limited utility. At all events, the record is barren of evidence of the existence of shopping centers and parks in these towns....

The home, by contrast, has special advantages. Precisely because the homeowner may slam the door in the solicitor's face the moment he or she feels threatened by either the solicitor or his ideas, and precisely because the home is often a place of quiet where the homeowner may have the time to engage in some prolonged discussion, it is a particularly valuable forum for communication. It is of course true, as the majority notes, that the defendant towns have not barred door-to-door solicitation but have merely limited the hours during which it may take place. The question, however, is whether the limitations are too stringent. By eliminating evening solicitation (or even late afternoon solicitation as in Munhall), the ordinances prevent the plaintiff organization from reaching significant segments of the population who are not at home during the day. And while the ability to solicit on Saturday provides some relief from this restriction, it strikes me as inadequate. Restricted to Saturdays, the plaintiff organization, with its finite number of members, may well be unable to reach most of those who are at home on Saturdays but not on weekdays. Many of these same people

are at home during the weekday evenings and could be reached if canvassing were allowed on weekdays and evenings. Moreover, many who would be at home during weekday evenings and thus accessible to the plaintiff organization will be away on Saturdays, especially in the summertime. 743 F.2d at 194–95. The dissenter further notes that, according to a study conducted in 1976 by the Research Triangle Institute, the odds of reaching at least one member of a household increases dramatically from 0.39 to 0.57 between 9:00 a.m. and 5:00 p.m. on weekdays to 0.58 to 0.68 between 5:00 p.m. and 10:00 p.m. on weekdays. 743 F.2d at 195 n. 17.

We concur with the reasoning of the dissenting opinion in *Pennsylvania Alliance;* with the analysis of the Eighth Circuit in *Association of Community Organizations;* and with the majority of courts which have addressed this issue. In our view, the majority opinion in *Pennsylvania Alliance* placed too great an emphasis upon the "ample alternative channels of communication" standard as applied in *Heffron,* 452 U.S. 640 at 654–55, 101 S.Ct. 2559 at 2567–68, 69 L.Ed.2d 298 at 311. In effect, the majority in *Pennsylvania Alliance* utilized the "ample alternative channels of communication" standard to shift the first amendment fulcrum in order to grant greater leverage to government over those wishing to exercise their fundamental free speech rights. In *Schneider,* 308 U.S. at 163, 60 S.Ct. at 151, 84 L.Ed. at 166, involving restrictions on door-to-door canvassing and solicitation, the Court noted, in rejecting a contention that the availability of alternative channels of communication was sufficient to sustain their constitutionality, that, "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

We believe the fatal flaw in the majority opinion in *Pennsylvania Alliance* is its exclusion from consideration of less restrictive alternatives for advancing the governmental interests served by the temporal regulation of door-to-door canvassing and solicitation activities. *See* L. Tribe, *American Constitutional Law* § 12–20 (1978). The first amendment requires precision in the regulation of the exercise of free speech rights. *See Secretary of State v. Joseph H. Munson Co.,* 467 U.S. at 961–962, 104 S.Ct. at 2849, 81 L.Ed.2d at 798; *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772, 789 (1984); *Heffron,* 452 U.S. at 647–48, 101 S.Ct. at 2563–64, 69 L.Ed.2d at 306–07 (1981); *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68–71, 101 S.Ct. 2176, 2182–84, 68 L.Ed.2d 671, 679–82 (1981); *Carey v. Brown,* 447 U.S. 455, 470–71, 100 S.Ct. 2286, 2295–96, 65 L.Ed.2d 263, 275–76 (1980); *Schaumburg,* 444 U.S. at 637, 100 S.Ct. at 836, 63 L.Ed.2d at 88; *Grayned,* 408 U.S. at 115–17, 92 S.Ct. at 2302–04, 33 L.Ed.2d at 231–33; *Police Department of Chicago v. Mosley,* 408 U.S. 92, 98, 92 S.Ct. 2286, 2291–92, 33 L.Ed.2d 212, 218 (1972). Whether explicitly or implicitly, less restrictive alternatives must be considered in order to determine whether the challenged regulation is sufficiently narrow so as not to prohibit that which should be protected. Therefore, we reach a different conclusion under the first amendment with regard to the ordinances upheld in *Pennsylvania Alliance, Westfall,* and *McMurdie.* Less restrictive alternatives, such as registration and identification procedures; the enforcement of laws criminalizing fraud, burglary, and trespass; and the enforcement of laws requiring compliance with no solicitation signs and requests not to be disturbed, all provide less restrictive means for furthering the legitimate governmental interests in the prevention of crime and the protection of privacy associated with door-to-door canvassing and solicitation. The first amendment cannot exist in a vacuum, without reference to alternative mechanisms for advancing legitimate governmental interests which might impinge upon the exercise of fundamental freedoms of expression, association, assembly, and petition, "[b]ecause First Amendment freedoms needing breathing space to survive...." *Button,* 371 U.S. at 433, 83 S.Ct. at 338, 9 L.Ed.2d at 418.

We conclude our analysis by noting that even if such a result were not compelled by the first amendment, our state constitutional free speech provisions would certainly compel such a result. West Virginia Constitution art. III, § 3 provides:

Government is instituted for the common benefit, protection and security of the people, nation or community. Of all its various forms that is the best, which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter or abolish it in such manner as shall be judged most conducive to the public weal.

In *Pushinsky v. Board of Law Examiners*, 164 W.Va. 736, 266 S.E.2d 444, 449 (1980), involving the refusal of the Board of Law Examiners to process an application for admission to the bar due to failure of the applicant to respond to questions concerning the advocacy of or knowing membership in organizations advocating the overthrow of the government by force or violence, this Court stated:

[I]n view of our state constitutional provision regarding the right of the majority to "reform, alter, or abolish" an inadequate government, we think that the West Virginia Constitution offers limitations on the power of the state to inquire into lawful associations and speech more stringent than those imposed on the states by the Constitution of the United States.

Similarly, under West Virginia Constitution art. III, § 3, and under West Virginia Constitution art. III, § 2, which provides that, "All power is vested in, and consequently derived from the people. Magistrates are their trustees and servants and at all times amenable to them," this Court stated in *Webb v. Fury*, 167 W.Va. 434, 282 S.E.2d 28, 37 n. 4 (1981), involving a defamation action by a coal company against an environmental activist who sought to influence governmental surface mining policy through communications with various governmental agencies and through publication of a newsletter, that, "West Virginia's constitutional provisions respecting the right to petition warrant that we give even greater room for activities alleged to be protected by the right.... [W]hile the United States Constitution guarantees to the people the right to petition all branches of government, the West Virginia Constitution also gives the people the right to 'reform, alter or abolish' it." Finally, under West Virginia Constitution art. III, § 1, which provides, in pertinent part, that, "All men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity," this Court held in *Woodruff v. Board of Trustees of Cabell-Huntington Hospital*, 173 W.Va. 604, 319 S.E.2d 372, 379 (1984), involving the dismissal of public hospital employees for engaging in the group distribution of leaflets, that, "[W]ith respect to the waiver of fundamental constitutional rights, our state constitution is more stringent in its limitation on waiver than is the federal constitution."

In Syllabus Point 7 of *Webb v. Fury*, this Court held that, "The right to petition involves, among other things, activity designed to influence public sentiment concerning the passage and enforcement of laws as well as appeals for redress made directly to the government." As previously noted, the petitioners' activities serve as catalyst and conduit for the expression of the needs and desires of the public with respect to their governmental institutions. These are precisely the types of activities, protected under our state constitution's expanded right to petition, recognized by this Court in *Webb v. Fury*.

▮ Accordingly, we hold that restrictions on door-to-door canvassing and solicitation which do not permit some evening activity during the week impermissibly impinge upon the free speech rights of groups and individuals who desire to utilize those modes of expression. We further

hold that the failure to define the term "sunset" in an ordinance restricting door-to-door canvassing and solicitation to "between 9:00 a.m. and sunset" renders such ordinance unconstitutionally vague.

For the foregoing reasons, we grant a writ of mandamus invalidating Fairmont ordinance 711.12 as unconstitutionally overbroad and vague.

Writ granted.