425 S.E.2d 194

**Sandy FISHER, Petitioner,**

v.

**The CITY OF CHARLESTON; Kent Strange Hall, Mayor of Charleston; Al J. Carey, Zoning Inspector; and Curt Voth, City Manager, Respondents.**

**No. 21356.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 7, 1992.

Decided Dec. 16, 1992.

Deborah L. McHenry, Ranson, Ranson & McHenry, Charleston, for petitioner.

Charles O. Lorensen, Charleston, for respondents.

BROTHERTON, Justice:

This petition for a writ of mandamus was filed by Sandy Fisher, a registered voter in Kanawha County, West Virginia. She is politically active in grass roots political, consumer, and citizens issues and lives in the newly-created Kanawha County minority-influence legislative district. In the May 12, 1992, primary election, she supported a minority candidate for the West Virginia Legislature. The petitioner attempted to promote her candidate by placing an 8½″ × 11″ black and white candidate support sign in the front window of her home and in her front yard.

On February 7, 1992, the Charleston City Manager Curt Voth sent a letter to candidates to "remind" them of the zoning ordinances "as they apply to placement of political signs in residential areas and public rights of way in our beautiful city. . . .

These signs can sometimes be damaging to trees, and often create an unsightly appearance. Under the City of Charleston zoning law, political signs are considered to be 'off-premise' signs since they contain messages unrelated to services where the signs may be located. They are not permitted in residential areas or the downtown district."

In April, 1992, the appellant attempted to place candidate signs in the window of her home and in her yard. She was advised by Al Carey, the Zoning Inspector for the City of Charleston, that she could not put the signs in her home or yard. On April 7, 1992, the petitioner received material from the city manager advising her how to appeal for a variance so that she could put up her candidate support signs. Thus, on April 14, 1992, she filed an application to the Board of Zoning Appeals of the City of Charleston. In the application the petitioner stated that she "wished to put a sign in my window and in my yard that would state 'Vote for Norman Ferguson for House of Delegates.'"

The Board of Zoning Appeals scheduled a hearing on her application for May 28, 1992. Unfortunately, this was sixteen days after the primary election, and her candidate had lost the election. At the hearing, the petitioner explained that the City had violated her right to freedom of expression of her political views by preventing her from putting these signs in her yard and window. The Municipal Beautification Commission opposed her application, and on May 29, 1992, the Board of Zoning Appeals denied her application based upon Zoning Ordinances §§ 18–1–1 and 21–10. The Board ruled that "the applicant has failed to show any facts or circumstances unique to the subject property which would justify the granting of the variance requested." It is from this denial that the petitioner files this petition for a writ of mandamus.

The petitioner contends that the City ordinances which prohibit the use of political signs on private property violate her First Amendment right to free speech and are extremely vague in that the ordinances do not provide sufficient notice of the activity proscribed or include precise definitions of operative terms. Thus, the petitioner argues that the ordinance allows authorities to exercise excessive discretion in enforcing them, as evidenced "by the fact that a number of signs could be seen throughout the city prior to the primary and the fact that upon information and belief various city officials told citizens that they really didn't enforce the regulation the last two weeks before the election." However, the petitioner offered no proof of that allegation. The respondents counter that the City has reasonably limited the use of printed material based upon their legitimate interests in safety and aesthetics, and that the restrictions are reasonable time, place, and manner rules.[1]

The intent behind the prohibition of signs within the City of Charleston is found in Zoning Ordinance § 21–1:

1. Section 18–1.1 of the Charleston Zoning Ordinance provides the general prohibition against signs, handbills, posters, and other advertisements and notices:

No person shall stick, print, stamp, attach, hang or suspend upon any public building, traffic sign, street marker or upon any pole or upon any telephone, telegraph or other poles belonging to the city or to electric, telephone, telegraph or other companies, or upon any street or sidewalk, pavement or any other public place any printed, written, painted or other advertisement, bill, notice, political poster or advertisement or any other sign or poster.

No papers, handbills, cards, circulars, political advertisements or advertising matter of any kind shall be thrown, pushed, cast, deposited, dropped, scattered, distributed or left in or upon any street, sidewalk, or other public place, or upon any vacant lot or premise within the city, if it is likely that the material might be scattered by the wind upon the streets or public places within the city; provided, that the provisions of this section shall not prevent the delivering of newspapers within the city.

No structure of any kind to be used as a sign or advertising of any sort shall be built, placed, erected, hung or left in or upon any street, sidewalk or other public place, except such as may lawfully be allowed under the laws of the city.

Section 24–6 provides penalties for violations of these ordinances. A violation is a misdemeanor, carrying a fine of not more than $300.00 nor less than $10.00. Each day of violation constitutes a separate offense.

It is recognized that signs are a legitimate business land use and have a right to exist within the City of Charleston. This article is to regulate signs in such a manner as to provide for the reasonable and orderly display of permitted signs. It is the intent of the sign regulations to:

(a) Provide for the size, location, construction, and manner of display of signs; and

(b) Permit such signs that will not, by reason of their size, location, or manner of display, endanger life or limb, confuse traffic, obstruct vision, or otherwise endanger the public morals, safety or welfare; and

(c) Prevent signs from causing an annoyance or disturbance; and

(d) Protect or improve aesthetic quality by regulating the placement and size of signs.

An "off-premise" sign is defined as "[a] sign which contains a message unrelated to a business or profession conducted or to a commodity, service or entertainment sold or offered upon the premise where such sign is located." Zoning Ordinance § 2–2.[2] An "on-premise" sign contains a message which is related to a business or profession or to a commodity, service, or entertainment sold or offered upon the premise where the sign is located. On-premise signs are allowed in all districts subject to general limitations on size, set-off, placement, and type. Off-premise signs are permitted only in designated districts, which do not include residential districts.[3] Zoning Ordinance § 21–10(c). Consequently, under Charleston's zoning ordinances, Ms. Fisher would be permitted to advertise a home business, but not her political views, unless she was the candidate whose signs she wished to display.[4]

The specific issue of restrictions on political speech has not been addressed by this Court prior to this case. However, we have ruled that political speech is "at the core of the interest protected by constitutional free speech guarantees." *West Virginia Citizens Action Group v. Daley*, 174 W.Va. 299, 324 S.E.2d 713 (1984). Citing *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957), *Daley* recognizes that "[t]he protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* 324 S.E.2d at 718 (citations omitted.) In *Daley*, the Court provides limitations on governmental regulation of the exercise of

---

**2.** City of Charleston ordinance § 21–10 is entitled *Off–Premise Sign Regulations,* and § 18–1–1 is entitled *Advertisements, Handbills, Signs, Etc.* Section 21–10 provides:

(a) Off-premise signs shall be permitted in the following districts:
(1) C–6 Community Commercial District and C–10 General Commercial District.
(2) I–2 Light Industrial District.
(3) I–4 Heavy Industrial District.
(b) Off-premise signs in a SPI–UR District shall be governed by the Council approved plans for such a district.
(c) If not expressly permitted in (a) or (b) above, off-premise signs shall be prohibited.

**3.** Zoning Ordinance § 21–7(a) permits on-premise signs:

(1) One non-illuminated nameplate sign is permitted on either a wall or ground pole, identifying the owner or occupant of a residential building, provided the surface area does not exceed one square foot and the sign is set back at least three feet from the front property line. The maximum height of the sign shall be six feet.

(2) One sign, not to exceed 12 square feet in area, shall be permitted for the following uses where permitted: Church, school, museum, other community facility, other special permit use, planned unit development, group housing development, subdivision, or nonresidential principal use. Such sign shall be solely for the purpose of identifying the use and its services or activities and may be illuminated (no exposed neon). Such sign shall not be closer than ten feet to the curb nor more than ten feet in height.

(3) A home occupation may be identified by one wall sign not exceeding a total area of two square feet, affixed to the building, and not projecting more than one foot beyond the building. Illumination of such sign shall be either by means of white non-flashing enclosed light design or by indirect lighting from a shielded source.

**4.** Candidate signs displayed at the home of that particular candidate are considered on-premise and are permitted. According to the City, Zoning Ordinance 21–7(a) controls the maximum size, set back, and sign type for on-site candidate signs.

the free speech guarantee: "To minimize the potential 'chilling effect' of regulations governing the exercise of rights guaranteed under constitutional free speech provisions, those regulations must be both narrowly and clearly drawn." *Id.* at syl. pt. 2.

The United States Supreme Court has discussed the issue of governmental entities controlling speech, although the precise issue present in this case has not been addressed. The facts before us today are similar, although not identical, to those found in *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 503, 101 S.Ct. 2882, 2890, 69 L.Ed.2d 800 (1981).[5] *Metromedia* involved the City of San Diego's attempt to prohibit "outdoor advertising display signs," narrowly defined by the California Supreme Court as a "rigidly assembled sign, display or device, permanently affixed to the ground or permanently attached to a building or other inherently permanent structure constituting, or used for the display of, a commercial or other advertisement to the public." *Metromedia v. City of San Diego,* 26 Cal.3d 848, 164 Cal.Rptr. 510, 513, n. 2, 610 P.2d 407, 410, n. 2 (Cal.1980).[6] Exempted from the prohibition was, among other types of signs, "temporary political campaign signs." *Metromedia,* 453 U.S. at 493–94, 101 S.Ct. at 2885.

In ruling that off site commercial billboards could be prohibited while on-site commercial billboards were permitted, the Court stated that "[i]t does not follow, however, that San Diego's general ban on signs carrying noncommercial advertising is also valid under the First and Fourteenth Amendments. The fact that the City may value commercial messages relating to on-site goods and services more than it values commercial communications relating to off-site goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others." *Id.* at 512–13, 101 S.Ct. at 2895.

In *Metromedia,* the United States Supreme Court indicated that "insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." *Id.* at 513, 101 S.Ct. at 2895.

Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests.... With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Consolidated Edison Co., [v. Public Service Commission ],* 447 U.S. [530], at 538, 100 S.Ct. 2326 [at 2333]. Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.

*Id.* at 514, 101 S.Ct. at 2896. Thus, the Court concluded that if a city permits commercial advertising, then it cannot preclude noncommercial speech.

■ In the case now before us, the City of Charleston shows a preference for commercial speech by generally allowing commercial signs, but prohibiting most noncommercial signs. Applying *Metrome-*

---

5. In *Metromedia,* the United States Supreme Court ruled that weighing First Amendment interests against the public interest served by a zoning ordinance which restricted signs "requires a particularized inquiry into the nature of the conflicting interests at stake here, beginning with a precise appraisal of the character of the ordinance as it affects communication." 453 U.S. at 503, 101 S.Ct. at 2890.

6. In footnote 2, the United States Supreme Court noted that the California Supreme Court purposefully adopted a narrow definition designed to focus on billboards rather than other signs like "a small sign placed in one's front yard proclaiming a political or religious message." 453 U.S. at 494, n. 2, 101 S.Ct. at 2885, n. 2.

*dia*'s findings to these facts, it is clear that insofar as the City of Charleston allows commercial signs, such as on-site advertising, it cannot forbid noncommercial speech, such as political signs. As noted in *Metromedia,* the City "may not choose the appropriate subjects for public discourse."[7] *Id.* Consequently, the City of Charleston cannot forbid political candidate signs while permitting commercial advertising.

We acknowledge that there is a distinction between the San Diego billboard regulation and the Charleston ordinances. The Charleston zoning ordinances limit the commercial signs to on-site commercial advertising signs and does permit candidate signs at the home of the candidate whose sign is displayed. The San Diego ordinance addressed billboards located in areas quite different from the largely residential area at issue in this case. Nonetheless, we believe the general premise of *Metromedia* is applicable to our case. It is improper for a city to allow on-site commercial signs while forbidding what amounts to on-site noncommercial signs: the political thoughts of the owner of that property.

We conclude that the City unconstitutionally limited a citizen's right to express noncommercial political speech by forbidding all political or candidate signs. This does not mean, however, that the City cannot provide some regulation of the political or candidate signs. Thus, we next discuss what limits the City can place on the right of a citizen to display noncommercial political or candidate signs in her yard or home.

In *Schneider v. New Jersey,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), the United States Supreme Court first discussed the issue of a governmental prohibition on expression. In *Schneider,* the Supreme Court invalidated a restriction on door-to-door and street distribution of circulars, where valid governmental purposes

could be achieved through less restrictive alternatives. The Court concluded that the purpose of keeping the streets clear was insufficient to justify an ordinance which would prohibit all public distribution of circulars.[8] As a method of determining what speech could be abridged in this manner, the Court adopted a balancing approach and found that the state's purpose in maintaining reasonably clean streets at low cost could be achieved by measures less drastic than a total ban on all handbills.[9] *Id.* at 162, 60 S.Ct. at 151.

More recently, in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the United States Supreme Court stated that the primary consideration in determining whether a governmental regulation on speech is proper depends upon several factors: "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* at 791, 109 S.Ct. at 2754 (citations omitted). A government's restrictions on the exercise of First Amendment free speech rights will be sustained if the regulations " 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 82 L.Ed.2d 221, 104 S.Ct. 3065 [3069] (1984)." *Id.*

In the case now before us, we agree with the respondents' assertions that the ordinance is generally content neutral. This is illustrated by the numerous other types of signs the ordinance forbids in addition to political or candidate signs, although there are unsubstantiated allegations of unequal application. A narrower

---

7. Like the United States Supreme Court in *Metromedia,* we do not address the issue of the effect of a total ban on all advertising, both commercial and noncommercial. *Metromedia,* 453 U.S. at 515, n. 20, 101 S.Ct. at 2896, n. 20.

8. *See also Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), in which the Court invalidated a state ordinance which pro-

hibited the distribution of circulars not carrying the name and address of the person who prepared, distributed, or sponsored it.

9. *See generally* Note, "Less Drastic Means and the First Amendment", 78 Yale Law Journal 464 (1969).

issue exists, however, of whether the ordinance is "narrowly tailored" to serve the governmental interest in preserving the appearance and safety of the neighborhoods. "[T]he requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799, 109 S.Ct. at 2758 (citations omitted). The regulation "need not be the least restrictive or least intrusive means of doing so." *Id.* at 798, 109 S.Ct. at 2757.[10]

■ We believe that the rule found in *Schneider,* discussed *supra,* is implicit in the requirement of *Ward v. Rock Against Racism.* Thus, in order to control the use of noncommercial political or candidate signs on private property, the government must (1) have a legitimate, significant interest in the regulation; (2) the restrictions which regulate the time, place, and manner of the speech must be narrowly tailored to achieve those goals and go no further than necessary to achieve the government's goal; (3) the regulation may not burden a substantial portion of speech in a manner that does not advance its goals; and (4) the regulation must leave open ample alternative channels for communication.[11]

■ While we agree that there is a legitimate and significant governmental interest in aesthetics and preserving the quality of life, the current City ordinance is much too broad and places a substantial burden on the regulation of speech in a manner that does not serve to promote its goals.

While *Rock Against Racism* does not require that the ordinance be the least restrictive alternative, the Charleston ordinance is overbroad. As it is now written, the ordinance leaves open few alternative channels for communication of the political information. With few resources, the petitioner's opportunity to express her views is very limited. In this era of multimillion dollar campaigns for political office, the right of an individual to express herself at a reasonable cost seems even more vital. That right takes on a more critical element when the individual attempts to do so from her own property.[12]

Nor do we believe *Metromedia* grants the homeowner a year-round right to place political signs in her yard or home, as the respondents contend. As we noted above, *Metromedia* dealt specifically with billboards, which were available year round for commercial use for those who wished to pay for the right to advertise. Nothing in *Metromedia* supports the right to the unlimited use of political signs. In fact, the Court mentions, albeit briefly, that temporary candidate and political signs were permitted without finding that the City of San Diego erred in allowing the signs only temporarily. *Metromedia,* 453 U.S. at 514, 101 S.Ct. at 2896. Although the Court in *Metromedia* rejected the appellee's suggestion that the San Diego ordinance was appropriately characterized as a "reasonable time, place and manner" restriction, it explained that such restrictions are permissible under certain circumstances:

---

**10.** In *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Supreme Court quoted *Metromedia,* stating that "the city's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect." *Id.* at 807, 104 S.Ct. at 2130 (citations omitted).

**11.** In *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the United States Supreme Court adopted a four part test for determining the validity of governmental regulation of commercial speech, which is generally accorded "a lesser protection ... than ... other constitutionally guaranteed expression." *Id.* at 566, 563, 100 S.Ct. at 2351, 2350.

**12.** *See also Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), and *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), for cases in which a governmental agency attempted to prohibit speech, from a certain forum, relating to political campaigns while permitting other types of speech. Although the Court upheld the prohibition on the expression, *Metromedia* noted that the decisions were based upon the particular facts of those cases. *Metromedia,* 453 U.S. at 514, n. 19, 101 S.Ct. at 2896, n. 19. *Lehman* involved an attempt to place political advertisements on public transit vehicles. *Greer* discussed the right of political candidates to distribute literature or make speeches on a military post where military regulations prohibited such actions without prior approval.

The ordinance does not generally ban billboard advertising as an unacceptable "manner" of communicating information or ideas; rather, it permits various kinds of signs. Signs that are banned are banned everywhere and at all times. We have observed that time, place, and manner restrictions are permissible if "they are justified without reference to the content of the regulated speech, ... survey significant governmental interests, and ... leave open ample alternative channels for communication of the information." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. [748], at 771, 48 L.Ed.2d 346, 96 S.Ct. 1817 [1830].

*Id.* 453 U.S. at 515–16, 101 S.Ct. at 2897. Unlike *Metromedia*, the facts in the present case involve largely residential areas which are not traditionally blanketed with signs and advertising, and thus, are inherently different from the locales in which billboards are generally found.

■ There is no question that the City is entitled to adopt a zoning ordinance which promotes their interest in land use planning. *See* W.Va.Code § 8–24–1 *et seq.* (1990). Further, we agree that the respondent has a substantial interest in protecting and preserving the residential quality within the City by reducing the clutter created by signs and promoting safety on residential streets by limiting these signs. However, the zoning ordinance in question is overbroad: A city cannot forbid noncommercial advertising while allowing commercial advertising, although some regulation is permitted.

■ We believe that permitting the political signs on a temporary basis, as well as regulating size, set back, type, and number, would be considered a reasonable time, place, and manner restriction. The temporary nature of the signs is justified without reference to the content of the sign and serves a significant and legitimate governmental interest in maintaining order and safety in residential and downtown areas. Although the signs are temporary, they are permitted at the time they are most necessary for the expression of political views.

Once the elections are over, there are other avenues which leave open ample alternative channels for communication of the information in question.

Given the time, place, and manner restrictions discussed in *Ward* and *Schneider*, we believe the zoning ordinance would be both reasonable and narrowly tailored if it permitted the placement of temporary political or candidate signs for a specified period of time before primary and general elections, with the requirement that all signs must be removed within a specified period after the polls close. Further, the number of signs permitted could be limited, within reason, as well as the size, type, placement, and set back, for reasons of safety, public morals, and aesthetics. We suggest that the specifics regarding the sign type, size, and set back coordinate with Zoning Ordinance 21–7(a), which sets out the requirements for on-premise candidate signs.

■ In order for a petition for a writ of mandamus to succeed, the petitioner must show three things: "(1) a clear right in the petitioner to the relief sought; (2) a clear legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). Ms. Fisher has demonstrated a clear right to her petition requesting that the zoning ordinance be declared unconstitutional, a clear legal duty on the part of the Zoning Board to allow the temporary candidate signs, and no other adequate remedy at law.

■ Accordingly, we grant the petition for a writ of mandamus and rule that the City of Charleston Zoning Ordinances §§ 18–1–1 and 21–10 are unconstitutionally overbroad in forbidding temporary candidate or political signs, and that the Zoning Board of Appeals erred in denying the petitioner's application. It is up to the Charleston City Council to rewrite a narrowly tailored zoning ordinance dealing with temporary political or candidate signs, in accor-

dance with the provisions set forth in this opinion.

Writ granted.