Willie MORRIS, Plaintiff-Appellant,

v.

Forrest David MATHEWS, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 76–1516.

United States Court of Appeals, Sixth Circuit.

Argued April 4, 1977.

Decided June 24, 1977.

David S. Bloomfield, Fontana, Ward, Kaps & Perry, Robert J. Perry, Columbus, Ohio, for plaintiff-appellant.

William W. Milligan, U.S. Atty., Thomas D. Thompson, James E. Rattan, Columbus, Ohio, for defendant-appellee.

Before EDWARDS, PECK and LIVELY, Circuit Judges.

EDWARDS, Circuit Judge.

Appellant Willie Morris appeals from the order of a District Judge in the United States District Court for the Southern District of Ohio affirming the Secretary's denial of his claim for black lung benefits. We reverse and remand for payment of benefits.

Appellant is now 67 years old. It is undisputed on this record that he has a fourth grade education, that he worked in the coal mines for 23 years and subsequently was self-employed at a beer garden and pool

hall between 1955 and 1969, after which he ceased all gainful employment. Appellant and several co-workers testified before the Administrative Law Judge to the effect that he had to leave mining work because of weakness and breathing difficulty.

Appellant's physician, Dr. Buff, diagnosed him as suffering from "1. Pneumoconiosis and/or Silicosis. 2. Hypertensive Cardiovascular Disease." Under "Diagnosis," Dr. Buff added, "[i]n my opinion, this patent is totally disabled from a gainful occupation." Similar medical findings as to pneumoconiosis and disability were entered in the hearing record from Dr. Henry J. Pitsenberger and Dr. Edward J. Berkich. Each of these physicians had examined appellant in person, as well as having had the benefit of lung X-rays and ventilatory tests.

There is no evidence, either personal or documentary, in this record which contradicts the conclusion reached by these doctors, that appellant is totally disabled for mining or any comparable occupation. See 30 U.S.C. § 902(f) (Supp. II, 1972); 20 C.F.R. § 410.412 (1976). The question which presumably is at issue is whether or not appellant's disability was caused by pneumoconiosis occasioned by his long years of employment in the mines.

In contrast to the views of Drs. Buff, Pitsenberger and Berkich that appellant was disabled by pneumoconiosis, there was no medical opinion which stated either that appellant did not have pneumoconiosis or that his pneumoconiosis was not disabling. In addition to the three doctors just discussed, Drs. Nelson, Hwang, Sattler, Fish, Weinberger and Billings all found either X-ray readings or ventilatory tests which they believed to show pneumoconiosis or to be "compatible" therewith. Three of these doctors (Nelson, Weinberger and Sattler) specifically found X-ray evidence of pneumoconiosis 2P. or 2–3P. On the other hand on the basis of the same or like films or tests, Drs. Donner, Weinstein, Gayler, Siegelman and Gaziano all reported negative findings as to pneumoconiosis. No one of these doctors, however, gave an opinion

that appellant did not have pneumoconiosis or was not disabled by it.[1]

■ In considering this claim, neither the A.L.J. nor the District Court considered the fact that the record cited above clearly entitled appellant to a rebuttable presumption of total disability under 30 U.S.C. § 921(c)(4) (Supp. II, 1972), which reads:

[I]f a miner was employed for fifteen years or more in one or more underground coal mines, and if there is a chest roentgenogram submitted in connection with such miner's, his widow's, his child's, his parent's, his brother's, his sister's, or his dependent's claim under this subchapter and it is interpreted as negative with respect to the requirements of paragraph (3) of this subsection, and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis, that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis. In the case of a living miner, a wife's affidavit may not be used by itself to establish the presumption. The Secretary shall not apply all or a portion of the requirement of this paragraph that the miner work in an underground mine where he determines that conditions of a miner's employment in a coal mine other than an underground mine were substantially similar to conditions in an underground mine. The Secretary may rebut such presumption only by establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.

In *Ansel v. Weinberger,* 529 F.2d 304 (6th Cir. 1976), this court rejected negative X-ray and negative pulmonary function studies as evidence which suffices to rebut the § 921(c)(4) presumption. The court said:

The court further concludes that there is no substantial basis for the finding that Claude Ansel did not establish that he was totally disabled within the definition of the Black Lung Act. His treating physician stated unequivocally that Ansel was totally disabled for work in a coal mine. No other medical witness contradicted this statement, and the lay testimony supported Dr. Bope's opinion. The witness Otto White testified that he began working in the mines with Claude Ansel in 1933 and that Ansel was one of the best workers. Mr. White had continued to see Ansel "a couple of times a month" after they left the mine. He testified that even while walking downhill it was necessary for Mr. Ansel to stop and rest after 50 feet or so, and that his condition had gotten "a lot worse" in the last five years. The administrative law judge received this testimony as competent "other evidence" and considered it along with the medical evidence and the testimony of Mr. and Mrs. Ansel. He did not construe amended 30 U.S.C. § 923(b) as permitting lay testimony of persons other than the miner's wife only in cases where the miner is deceased. This is a reasonable construction. Since disability of a living miner may not be established by the wife's testimony alone under Section 921(c)(4), other lay evidence must have been contemplated.

There is no evidence in the record from which it could be concluded that at the time of his hearing Claude Ansel could engage ". . . in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time." 30 U.S.C. § 902(f). Though fluoroscopy disclosed an early stage of silicosis, a condition included within the definition of pneumoconiosis in 20 C.F.R. § 410.110(*o*), the applicant's chest X-rays were interpreted as negative with respect to the require-

---

1. Dr. Gaziano's report concerning appellant's breathing tests included the words "Normal ventilatory function." We interpret these words as meaning that appellant's ventilatory test findings were within normal limits.

ments of 30 U.S.C. § 921(c)(3) for an irrebuttable presumption of pneumoconiosis. Thus he relied on the rebuttable presumption of Section 921 (c)(4). Giving primary consideration to the medical evidence and considering the lay testimony concerning the limitations on Mr. Ansel's physical activities, all in light of Ansel's age, education and work experience, we hold that this record "demonstrates the existence of a totally disabling respiratory or pulmonary impairment. . . ." Section 921(c)(4). Since the Act provides that when these conditions are met "there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis . . ." *Id.*, the contrary finding of the administrative law judge affirmed by the district court was clearly erroneous unless the Secretary may be held to have rebutted the presumption.

The Secretary contends that the presumption was rebutted by evidence which established that Claude Ansel did not have pneumoconiosis. He relies on the negative findings of three radiologists who examined X-rays and the pulmonary studies. It is obvious that the negative X-rays may not be relied upon to rebut the presumption of Section 921(c)(4). If he had been able to produce a positive X-ray, there would have been no need to invoke the presumption. The very existence of a negative X-ray is a prerequisite to reliance upon the presumption of pneumoconiosis as established by other evidence. Furthermore, under the 1972 amendment, negative X-ray evidence may not be the sole basis for a denial of benefits. 30 U.S.C. § 923(b). Nor do we believe the presumption of Section 921(c)(4) can be rebutted by showing that pneumoconiosis was not established by pulmonary function studies. The regulation which establishes the levels required for a finding of disabling pneumoconiosis on the basis of a ventilatory study does not purport to provide proof of the non-existence of pneumoconiosis. Once Claude Ansel produced evidence which entitled him to the presumption of Sec-

tion 921(c)(4), that presumption could be rebutted only by establishing that he did not have pneumoconiosis, there being no contention that his impairment did not arise out of employment in the mines. In view of the unequivocal testimony of Dr. Bope, it appears that the Secretary would have been required at least to produce a medical opinion that Mr. Ansel did not have pneumoconiosis in order to rebut the presumption. No such testimony appears in this record. *See Whitson v. Finch,* 437 F.2d 728, 732 (6th Cir. 1971).

*Ansel v. Weinberger, supra* at 309–10.

In this case also, "[n]o such testimony appears in this record."

We believe that Mr. Morris is precisely the type of person intended to be benefited under the 1972 amendments to the Federal Coal Mine Health and Safety Act, 30 U.S.C. § 801 *et seq.* (1970), *as amended,* (Supp. II, 1972). The Senate Report which preceded adoption of this act clearly outlined both the sense of frustration experienced by Congress and its proposals for expanded coverage:

" 'The principal purpose of H.R. 9212, both as passed by the House of Representatives and as reported by the Committee on Labor and Public Welfare, is to compensate the miners, and the widows and children of miners, whose lives and health have been sacrificed in the production of that critical energy source—coal.

The Committee fully intends and expects that H.R. 9212, as amended, will more adequately meet the objectives originally sought in Title IV of the Federal Coal Mine Health and Safety Act of 1969 than either the basic law or H.R. 9212 as adopted in the House of Representatives.

To this end, the Committee made a number of significant changes in the legislation. It is anticipated that these changes, if enacted into law, will bring to the disabled coal miner and his family a greater measure of justice than they have known heretofore.

The Committee amendments, and the retained provisions of the House-passed bill, would:

Extend fully the Federal parts of the program for one year;

Make Federal and non-federal aspects of the Federal Black Lung Program permanent so that all claimants and beneficiaries now and in the future will be eligible for, or entitled to, life-time benefits;

Provide benefits to orphans of deceased miners, along with dependent parents, brothers and sisters;

Increase the amount of benefits payable to one who is receiving both Social Security disability and black lung benefits by limiting the combination of those benefits to 100 per cent of "average current earnings;"

*Relax the often insurmountable burden of proving eligibility by prohibiting a denial of claims based solely on a negative chest roentgenogram and by presuming that miners with 15 years experience who are disabled by a respiratory or pulmonary impairment are disabled by pneumoconiosis;*

Permit benefits to be paid in specified circumstances to surface, as well as underground miners;

*Alter the definition of total disability to permit claims based upon an inability to work at a mining job in which the miner was gainfully and regularly employed over a substantial period of time;*

Allow a widow to claim benefits if her husband was totally disabled by pneumoconiosis when he died, and make available to widows other means of establishing claims by, for example, providing affidavits of the husband's disability;

*Provide that additional tests, medical and lay evidence be utilized, where relevant, to establish eligibility for benefits;*

Authorize the construction of clinical treatment facilities for miners with lung impairments;

Permit the Secretary of Health, Education, and Welfare to certify directly to a dependent any increase in benefits attributed to such dependent and accept applications for benefits from dependents in their own right;

Authorize the initiation of research to develop tests to be used in the analysis of pulmonary and respiratory diseases and impairments;

Prohibit discrimination against any miner solely because he has pneumoconiosis or other respiratory ailments; and

Require notification of prior claimants that their claims are being considered with respect to the new amendments.

## BACKGROUND

The Federal Coal Mine Health and Safety Act of 1969 recognized, for the first time in Federal legislation, the inadequacy of compensation to miners totally disabled by coal workers' pneumoconiosis, or, as it is commonly called, "black lung." As the Senate Report on the original Act stated, this irreversible disease was "believed to have afflicted 100,000 of the Nation's active and retired miners." President Nixon, in his March 1969 message which called for a new coal mine health and safety act, said, "Death in the mines can be as sudden as an explosion or a collapse of a roof and ribs, or it comes insidiously from pneumoconiosis, or black lung disease."

At the time the Coal Mine Health and Safety Act was signed into law, only two and one-half years ago, it was generally thought that coal miners' occupational breathing disabilities were encompassed by the term "pneumoconiosis". Members of Congress, the knowledgeable press, and many physicians believed this to be the case. It was generally believed that title IV of the Act, relating to black lung benefits, would be a satisfactory means of compensating miners who were incapacitated by respirable diseases, as well as the surviving widows and children of miners who had died from the dread black lung.

*Since the passage of that basic, necessary, desirable Act however, experience has taught us that all is not as we expected.* As of March 3, 1972, 356,857 claims had been filed since the effective date of the Act, December 30, 1969. According to the Social Security Administration 91,784 disabled miners and 74,809 widows have re-

ceived benefits, for a total of 166,593 claims, while 169,999 claims have been denied.

*Not only have the number of claims far exceeded those earlier expectations of Congress, indicating a more widespread and more serious problem than they anticipated, but also the rate of denials—more than fifty percent nationwide, and as high as 72 percent in some states—suggests strongly that the solution has not been nearly as complete as Congress believed and expected it would be.*

\* \* \* \* \* \*

Existing law limits benefits to those whose claims are based on totally disabling pneumoconiosis, a progressive chronic dust disease of the lung. *Although title IV of the 1969 Act is couched in terms of pneumoconiosis, it has become glaringly apparent that the Act is not benefiting many of the nation's disabled coal miners who Congress intended to benefit. Testimony has indicated that miners with disabling breathing impairments who cannot be diagnosed medically as suffering from pneumoconiosis, because of the state of the art, are being denied benefits though they are as severely and often times more severely impaired than miners whose claims have been granted.*

*The reasons for these denials are many. The great majority of denials are attributed to the inability of the miner to present X-ray evidence of the disease. Some have been denied because the simple breathing test, which measures only ventilatory capacity, may not adequately detect disabling respiratory or pulmonary impairment. Some have been denied because of the failure to recognize the special problems encountered by disabled miners in obtaining gainful employment outside of coal mining in Appalachia.*

Over a hundred years ago, Emile Zola wrote his nonmedical description of the coal miner in *Germinal:*

"Have you been working long at the mine?"

He flung open both arms.

"Long? I should think so. I was not eight when I went down and I am fifty-eight. They tell me to rest, but I'm not going to; I'm not such a fool. I can get on for two years longer, to my sixtieth, so as to get the pension."

A spasm of coughing interrupted him again.

"I never used to cough; now I can't get rid of it. And the queer thing is that I spit."

The rasping was again heard in this throat, followed by a black expectoration.

"Is it blood?"

He slowly wiped his mouth with the back of his hand.

"No, it's coal. I've got enough in my carcass to warm me till I die. And it's five years since I put a foot down below. I stored it up, it seems, without knowing it."

Suffice it to say that this miner's widow, were she alive today, would have great difficulty in obtaining benefits.

The reality of this projection has been borne out by the rate of denials to black lung claimants and their widows. In some states as many as 70 percent of the applicants have been turned down. The national average is a 50 percent denial rate.

Congress intended, through the 1969 Act, to recompense the disabled miner for his mine-related disease. It was believed that title IV would provide benefits to those who were so disabled.

Congress recognized when the Act was being considered, however, that the chest X-ray, or roentgenogram, was an imperfect means of ascertaining the existence of pneumoconiosis in coal miners. Testimony to that effect was provided by the Surgeon General, who produced a Public Health Service study showing the the existence of pneumoconiosis from autopsies performed on deceased coal miners who had, while living, been diagnosed by means of X-ray examination to be free of pneumoconiosis. For this reason the Senate Committee report on the 1969 Act specifically referred to the need to require medical tests other than

the X-ray to "establish the extent and severity of the disease." Many cases have come to the Committee's attention in which a minor is suffering from a severely disabling respiratory or pulmonary impairment, and yet he has no X-ray evidence of pneumoconiosis.

Because of the continuing recognition of the fact that X-ray evidence is not always satisfactory, the Committee retained a provision of the House bill which prohibits the denial of a claim solely on the basis of the results of a chest roentgenogram. It was anticipated by Congress in 1969 that other tests to establish pneumoconiosis would be developed through research. This has not been done, and the Social Security Administration continues to rely exclusively on the results of X-ray evidence.

*Testimony has further indicated that a negative X-ray is not proof positive of the absence of pneumoconiosis. Studies in addition to that of the Public Health Service confirm the existence of the disease by autopsy where a chest X-ray was negative, indicating an error of 25 percent in diagnosis.*

In addition, many believe that coal miners have a greater than average incidence of respiratory and pulmonary impairments other than pneumoconiosis. Considerable testimony was devoted to this premise. Even in 1969 the Surgeon General had stated that "medical researchers in both Britain and the United States have repeatedly shown that coal miners suffer from more respiratory impairment and respiratory disability than does the general population."

Similarly, noted pulmonary experts Drs. William S. Lainhart and Keith G. Morgan have stated that "it is fairly well accepted that coal miners have a higher prevalence of lung disease than does the general male population," and that "Several respiratory diseases occur more frequently in miners."

*Other testimony indicates that an X-ray may often be clouded by the presence of emphysema so that pneumoconiosis does not show on the X-ray. In some cases it has been alleged that the X-ray was of poor quality, and for that reason did not show the existence of black lung.*

*Senator Robert C. Byrd, in testimony before the Subcommittee on Labor on the pending black lung benefits legislation, spoke eloquently of this urgent problem. He said:*

> *"Let us stop quibbling with dying men as to whether their lungs are riddled with black lung or whether they are affected with asthma, or silicosis, or chronic bronchitis."*

An acknowledged expert in the field of pulmonary impairments of coal workers, Dr. Donald Rasmussen, Director of the Cardio-Pulmonary Laboratory at the Appalachian Regional Hospital, Beckley, West Virginia, testified as follows:

"The * * * assumption that coal workers' pneumoconiosis per se is the only disease process related to coal mining is not medically justified. Other conditions of the lung, in addition to pneumoconiosis, are commonly encountered among coal miners.

"While the exact causes of these conditions are not completely understood and while other nonoccupational factors may be in part responsible, no medical authority can prove these conditions to be unassociated with the mining exposure.

"Current medical concepts include viewing the lung diseases associated with coal mining as a broad spectrum of disease conditions. Often these conditions coexist with either coal workers' pneumoconiosis or silicosis. Some are in reality, sequelae to pneumoconiosis per se."

" * * * In general, the rewording of the definition of the pneumoconiosis, and other respiratory or pulmonary impairments brings a very needed measure of reality into the situation. By that, I mean, in terms of what is pneumoconiosis, there is a more reasonable approach than simply referring to the disease of coal miners in terms of pneumoconiosis.

"Since we do not know all of the specific disease entities which can arise as a consequence of the mining industry, we do not even know for that matter all of

the specific causes of these impairments, and so for this reason, a broadening of the definition, and broadening of the scope makes this a much more realistic situation, and so much more in keeping with the present state of medical knowledge."

Representatives of the Department of Health, Education and Welfare who testified before the Committee this year asserted that there is no medical evidence to verify that coal miners as a class suffer from a greater incidence of respiratory or pulmonary impairment, other than pneumoconiosis, than the rest of the male population. However, they also testified that there is no medical evidence to rebut the previously quoted testimony. That there is this apparent difference of view is unfortunate. For the miner and his survivors it is calamitous.

For at least the past decade Congress has appropriated funds specifically for research into the diseases of coal miners. And yet, the Executive Branch of Government does not have the answers.

*The Black Lung Benefits Act of 1972 is intended to be a remedial law—to improve upon the 1969 provisions so that the cases which should be compensated, will be compensated. In the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner or his survivors.*

*The Committee bill gives the benefit of the doubt to claimants by prohibiting denial of a claim solely on the basis of an X-ray, by providing a presumption of pneumoconiosis for miners with respiratory or pulmonary disability where they have worked 15 years or more in a coal mine, and by requiring the Social Security Administration to use tests other than the X-ray to establish the basis for a judgment that a miner is or is not totally disabled due to pneumoconiosis.'*"

S. Rep. No. 92–743, 92d Cong., 2d Sess. (1972); 1972 U.S. Code Cong. & Ad. News pp. 2305–07, 2312–15. (Emphasis added.)

 Both the Department of Health, Education and Welfare and the United States Courts are obligated to follow this act so as to give realistic and not niggardly effect to the stated Congressional purposes.

The judgment of the District Court is vacated and the case is remanded for entry of an award of disability benefits.