365 S.E.2d 345

**UNITED MINE WORKERS OF AMERICA, etc., et al.**

v.

**Kenneth FAERBER, Commissioner of the West Virginia Department of Energy, et al.**

No. 17076.

Supreme Court of Appeals of West Virginia.

July 10, 1986.

Dissenting Opinion Aug. 13, 1986.

**66**

Daniel F. Hedges, Charleston, Michael Holland, Gen. Counsel, UMWA, Washington, D.C., for United Mine Workers of America.

Robinson & McElwee, Timothy Miller, Joseph Price, Edward Hall, Charleston, for Faerber.

Jackson, Kelly, Holt & O'Farrell, John L. McClaugherty, Laura E. Beverage, Thomas N. McJunkin, Charleston, John L. Kilcullen, Kilcullen, Wilson, & Kilcullen, Washington, D.C., Kay, Casto & Chaney, Richard D. Jones, Thomas V. Flaherty, Charleston, for intervenors.

McHUGH, Justice:

In this mandamus proceeding the petitioners seek an order compelling enforcement of one or more statutes which allegedly require the use of "full roof bolting" in all underground coal mine sections in this State using auger-type continuous coal mining equipment.*

---

\* The petitioners also raise and brief two other issues which need not be discussed in detail in this opinion.

First, the petitioners contend that they as the miners' representative, or the miners themselves, have the implied statutory right or the procedural due process constitutional right to a hearing before the Director of the Division of Mines and Minerals of the West Virginia Department of Energy or before the West Virginia coal mine safety Board of Appeals upon the question of the continued certification of certain coal mine personnel.

Under *W.Va.Code*, 22-9-5 [1985] there are various miner specialties requiring certification, such as mine foreman-fire boss, assistant mine foreman-fire boss, shot firer, mine electrician and others. If miners or their authorized representatives have reason to believe that dangerous conditions are existing in or at any mine or that the law is not being complied with, they may request the Director of the Division of Mines and Minerals to have an immediate investigation made. *W.Va.Code*, 22A-1A-12 [1985]. A mine inspector, the Director or the Commissioner of the West Virginia Department of Energy may charge a mine foreman, assistant mine foreman, fire boss or other certified person with neglect or failure to perform any statutory duty. The charge is initiated by filing it with the Director or with the coal mine safety Board of Appeals. If the Board of Appeals determines from documents filed that probable cause exists to support the charge that the certified person has violated his or her duty, the Board shall conduct a hearing. If the Board finds from the preponderance of the evidence that the certified person has violated his or her duty, the Board shall suspend or revoke the person's certification. *W.Va.Code*, 22A-1A-29 [1985].

Thus, the statutes do not expressly authorize the miners or their authorized representative(s) to file a charge against a certified person with the Board of Appeals. The statutes also do not expressly require the Director to conduct a hearing to explain to the miners or their authorized representative(s) why, after investigation, the Director has decided not to file a charge against a certified person with the Board of Appeals. Are these procedures impliedly provided?

We do not resolve this issue in this mandamus proceeding. In syllabus point 2 of *State ex rel. Perry v. Miller*, 171 W.Va. 509, 300 S.E.2d 622 (1983), this Court held that the Director had the clearly implied power to suspend temporarily a person's certification after the Director has filed a charge against such person and after the Board has found probable cause, but prior to the evidentiary hearing. In this case, however, it is not as clear whether the procedural rights in question are impliedly provided. Here, unlike in *State ex rel. Perry v. Miller, supra,* the statutory sections are not silent on the procedural point(s) in question; instead, the express provisions arguably preclude implication of additional procedures, as the latter would arguably circumvent legislative intent as to who may initiate charges against certified persons. In any event, the statutory (and constitutional) construction necessary to resolve the issue should be made in a declaratory judgment action filed in accordance with *W.Va.R.Civ.P.* 57 and *W.Va.Code*, 55-13-1, *et seq.*, as amended. *Cf. United Mine Workers v. Miller*, 170 W.Va. 177, 183, 291 S.E.2d 673, 679 (1982) (mandamus, not declaratory judgment, relief appropriate where statute *clearly* imposes the duty in question upon the public officials, without any judicial construction).

The second issue raised and briefed by the petitioners which need not be discussed in detail is whether the Director's failure to apply administrative regulations pertaining to surface mines to the surface areas of underground mines is contrary to *W.Va.Code*, 22A-3-35 [1985] and *W.Va.Code*, 22A-3-3(w) [1985]. The amendment of *W.Va.Code*, 22A-2-53a, and the addition of two new sections, namely, *W.Va. Code*, 22A-2-53b and -53c, effective March 8, 1986, moot this issue. The 1986 legislation ap-

The petitioners are the United Mine Workers of America, the international officers thereof and one of the members of the West Virginia Board of Coal Mine Health and Safety. The respondents are the Commissioner of the West Virginia Department of Energy, the Director of the Division of Mines and Minerals of said Department and, as intervenors, coal operators engaged in this State in underground auger mining. The Commissioner and the Director have general supervisory and enforcement powers and duties relating to the energy policy of this State, including the production of coal and all other minerals. *See, e.g., W.Va.Code,* 22-1-4, -5, -7, -8, -10 and -15, and *W.Va.Code,* 22A-1-1, 22A-1A-2, -3 and -4 (all of these sections of the *Code* were amended in 1985). The record includes the amended petition, the respective answers of the originally named respondents as well as the intervenors, and numerous exhibits filed by the parties. In addition to the record and the briefs and oral argument of the parties, the Court has also considered the *amici curiae* brief of the West Virginia Coal Association and the National Independent Coal Operators' Association.

## I

*W.Va.Code,* 22A-2-25 [1985] and *W.Va. Code,* 22A-2-26 [1985], derived from and virtually identical to 30 U.S.C. § 862 (1982), provide minimum safety standards, subject to review and improvement on a continuing basis, to protect persons working in underground coal mines from falls of the roof or ribs of the mine. Roof falls are the leading cause of fatal accidents in mines. Braithwaite, *Enforced Self-Regulation: A New Strategy For Corporate Crime Control,* 80 Mich.L.Rev. 1466, 1484 & n. 57 (1982).

The coal operator has primary responsibility to prevent injuries and deaths resulting from working under unsupported roof. *W.Va.Code,* 22A-2-25(c) [1985]. Prior to commencing new operations, and subject to review at least semiannually, the coal operator must adopt a roof control plan, with input from the safety committee of the

pears to cover the areas of concern to the peti-

miners. The roof control plan and any revisions thereof must be approved by the Director of the Division of Mines and Minerals of the West Virginia Department of Energy. The plan shall show the type of support and spacing approved by the Director. *W.Va.Code,* 22A-2-25(a) [1985].

"Every operator shall require that no person may proceed beyond the last permanent support unless adequate temporary support is provided or temporary support is not required under an approved roof control plan and absence of such support will not pose a hazard to the miners." *W.Va. Code,* 22A-2-25(c) [1985]. "The method of mining followed in any coal mine shall not expose the miner to unusual dangers from roof falls." *W.Va.Code,* 22A-2-26(a) [1985].

There are no regulations promulgated by the West Virginia Department of Energy's Director of the Division of Mines and Minerals implementing the roof support provisions of *W.Va.Code,* 22A-2-25 and -26 [1985]. The implementing federal regulations are found at 30 C.F.R. §§ 75.200-1 through 75.200-14 (1985). There, the criteria for the various types of roof control plans are set forth. A "full roof bolting" plan is one in which roof bolts constitute the sole means of roof support at the working face. 30 C.F.R. § 75.200-7 (1985). A "conventional" roof control plan is one in which the installation of materials other than roof bolts, such as metal or wood posts, jacks, or cribs in conjunction with wooden cap blocks (half headers), footers (sills), planks and beams, are installed as the sole means of roof support at the working face. 30 C.F.R. § 75.200-8 (1985). "Spot roof bolting" involves the installation of roof bolts where adverse roof conditions are encountered, as a supplement to another approved type of roof control plan. 30 C.F.R. § 75.200-10 (1985). Where both roof bolts ("spot" bolting) and conventional supports are used for roof control at the working face, the roof control plan is known as a "combination" roof control plan. 30 C.F.R. § 75.200-9 (1985).

tioners.

In a coal mine, or a section thereof, using auger-type continuous mining equipment and a combination roof control plan, the wood (timber) posts furnishing the primary means of roof support must be systematically removed and relocated at the working face to allow the auger machine to extract the coal by moving laterally across the working face. Consequently, in auger-type continuous mining sections without full roof bolting, persons in the work crew at the working face must proceed beyond the last permanent roof support to (1) install temporary supports, (2) remove temporary supports, (3) set manual pull jacks on models of auger machines not having automatic jacks and (4) to shovel up to the jacks.

In non-auger ("drum" type) continuous mining sections, adequate temporary support is provided by automated temporary roof support (ATRS) systems. It is uncontroverted on the record that ATRS systems are not now technologically feasible for use in thin seam coal mines in which auger-type continuous mining equipment is used.

As of November 1, 1985, according to reports of the West Virginia Department of Energy, there were in this State 41 underground coal mines and 44 mine sections using auger-type continuous mining equipment. "Full roof bolting" is required in only nine of the forty-four underground auger sections; in all of the other sections having roof control plans, a "combination" roof control plan (timber posts and "spot" roof bolting) is utilized. No roof fall fatalities have occurred in the State of West Virginia in auger-type continuous mining sections with full roof bolting. In contrast, since the year 1974, 17 roof fall fatalities and numerous serious injuries have occurred in those sections not requiring full roof bolting. Reports of the investigations of these fatalities are silent on the effect of not having full roof bolting.

The petitioners assert that full roof bolting is required to be used in all underground auger-type continuous mining sections in this State. They assert that the second sentence of *W.Va.Code*, 22A-2-25(c) [1985], quoted *supra*, prohibiting persons from proceeding beyond the last permanent roof support (with two exceptions, argued by the petitioners to be inapplicable), and the first sentence of *W.Va.Code*, 22A-2-26(a) [1985], quoted *supra*, prohibiting exposure of the miners to unusual dangers from roof falls, require full roof bolting to be utilized. The petitioners also assert that the second sentence of *W.Va. Code*, 22A-2-25(a) [1985] requires full roof bolting: "The roof and ribs of all active underground roadways, travelways, and working places shall be supported or otherwise controlled adequately to protect persons from falls of the roof or ribs."

The respondents contend, however, that the third sentence of *W.Va.Code*, 22A-2-25(a) [1985] precludes a "blanket" requirement of full roof bolting in all underground mines using auger-type continuous mining equipment because that portion of the statute provides for the coal operator to develop, and the Director of the Division of Mines and Minerals to approve, "[a] roof control plan and revisions thereof suitable to the roof conditions and mining systems of each coal mine...." *Cf. Zeigler Coal Co. v. Kleppe*, 536 F.2d 398, 407 (D.C.Cir. 1976) (ventilation plans for underground coal mines are to deal with unique conditions peculiar to each mine and are not to be used to impose general requirements to all or nearly all coal mines).

## II

" [T]he first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner[.]" *W.Va.Code*, 22-6-1(a)(1) [1985] (quoting the Federal Coal Mine Health and Safety Act of 1969, as amended), also, incorporated by reference in *W.Va.Code*, 22A-1-1 [1985]. *See also United Mine Workers v. Scott*, 173 W.Va. 356, 360, 315 S.E.2d 614, 619 (1984); syl. pt. 1, *State ex rel. Perry v. Miller*, 171 W.Va. 509, 300 S.E.2d 622 (1983); syl. pt. 4, *United Mine Workers v. Miller*, 170 W.Va. 177, 291 S.E.2d 673 (1982); *Itmann Coal Co. v. Miller*, 166 W.Va. 84, 85, 272 S.E.2d 668, 669 (1980). *W.Va.Code*, 22A-1A-2 [1985] reiterates this point: "The division of

mines and minerals ... shall give prime consideration to the protection of the safety and health of the persons employed within or at the mines of this state."

█ Being remedial legislation, the mining health and safety statutes are to be viewed in the light most favorable to achieving the broad purpose of protecting the miner. *International Union, United Mine Workers v. Kleppe*, 532 F.2d 1403, 1405–06 (D.C.Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976). If interpretation of this type of legislation is necessary, the legislation is to be interpreted liberally to effect the purpose of protecting the health and safety of the miner. *Westmoreland Coal Co. v. Federal Mine Safety & Health Review Commission*, 606 F.2d 417, 419–20 (4th Cir.1979). It is important that the administrative agencies charged with the enforcement of mining health and safety legislation, as well as the courts, "give realistic and not niggardly effect to the stated [legislative] purposes." *Morris v. Mathews*, 557 F.2d 563, 570 (6th Cir.1977) (black lung benefits under Federal Coal Mine Health and Safety Act of 1969, as amended).

█ While the third sentence of *W.Va. Code*, 22A–2–25(a) [1985] provides for roof control plans to be mine-specific, that is, the statute provides for a mine-by-mine determination of roof control systems, this statute, as well as the other underground mine health and safety provisions set forth in *W.Va.Code*, 22A–2–1, *et seq.*, as amended, are minimum or "standard" health and safety "rules and regulations," *W.Va.Code*, 22–6–1(b)(2) [1985], and are subject to "frequent review, refinement and improvement ... to protect the health and safety of miners[.]" *W.Va.Code*, 22–6–1(a)(2) [1985]. The statute requires flexibility, not rigidity, in this area, as long as the health and safety of the miners are enhanced: "[S]uch standard rules and regulations ... when deemed appropriate to improve or enhance coal mine health and safety, [are] to [be] revise[d] ... or ... new rules and regulations dealing with coal mine health and safety" are to be developed and promulgated. *W.Va.Code*, 22–6–1(b)(3) [1985].

The transitory nature of mining health and safety standards, and the importance of modifying such standards when, *inter alia*, experience indicates the need for modification are recognized in the legislative history of the Federal Mine Safety and Health Amendments Act of 1977 and the Federal Coal Mine Health and Safety Act of 1969: "Standards must be generated on demonstrated needs of miners. This has not, in the past, been the case." S.Rep. No. 181, 95th Cong., 1st Sess. 15, *reprinted in* 1977 *U.S.Code Cong. & Ad.News* 3401, 3415. "In developing safety standards, in addition to the attainment of the highest degree of safety protection for the miners, other considerations should be ... experience gained under this and other safety statutes." H.R.Rep. No. 563, 91st Cong., 1st Sess., *reprinted in* 1969 *U.S.Code Cong. & Ad.News* 2503, 2531–32. *Accord*, S.Rep. No. 181, 95th Cong., 1st Sess. 61, *reprinted in* 1977 *U.S.Code Cong. & Ad. News* 3401, 3460.

Consequently, the mine-specific approach to roof control plans is not a fixed requirement; instead, such approach must be abandoned when it has been demonstrated that other roof control techniques improve or enhance coal mine health and safety. Life, limb and lungs of the miners are paramount, and each mining health and safety standard is subject to frequent refinement to achieve that paramount objective.

█ The total absence of roof fall fatalities in those auger-type continuous mining sections with full roof bolting, in contrast with the 17 roof fall fatalities in those auger-type continuous mining sections without full roof bolting, is telling. An inescapable inference is that full roof bolting provides more secure roof support than other types of roof control. The accuracy of these statistics, which were generated by the Department of Energy, is not questioned by the respondents, and they offer no explanation as to why there have been 17 roof fall fatalities in auger-type continuous mining sections without full roof bolting, while there have been no roof fall fatalities in auger sections with full roof

bolting. Tragic experience in this State has taught that mine-specific roof control plans do not adequately protect persons from roof falls in thin seam coal mines. Full roof bolting appears to be the clearly superior type of roof control in such mines.

We are aware of the concern of the coal operators that their economic interests are involved in this case. This Court will not, however, ignore the loss of life and limb in view of the fact that the statutes place the highest value on the health and safety of the miners.

Accordingly, we hold that "full roof bolting" is required to be utilized in all underground coal mine sections in this State using auger-type continuous coal mining equipment, under *W.Va.Code*, 22A-2-25(a) [1985], which provides that "[t]he roof and ribs of all active underground roadways, travelways, and working places shall be supported or otherwise controlled adequately to protect persons from falls of the roof or ribs."

### III

■ Mandamus is the appropriate relief in this case with respect to the requirement of full roof bolting. The law in this State is well settled as to when mandamus lies:

'A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.' Syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

Syl. pt. 1, *United Mine Workers v. Scott*, 173 W.Va. 356, 315 S.E.2d 614 (1984). *See also* syl. pt. 3, *Craigo v. Hey*, 176 W.Va. 514, 345 S.E.2d 814 (1986); syl. pt. 3, *Kimes v. Bechtold*, 176 W.Va. 182, 342 S.E.2d 147 (1986) (and cases collected at 152); syl., *Berry v. Boone County Ambulance Authority*, 176 W.Va. 43, 341 S.E.2d 418 (1986); syl. pt. 1, *Graf v. Frame*, 177 W.Va. 282, 352 S.E.2d 31 (1986).

The first two requirements for mandamus relief, namely, a clear legal right in the petitioners to the relief sought and the corresponding legal duty on the part of the respondents (to require full roof bolting in all underground coal mines using auger-type continuous mining equipment), have been established above in section "II" of this opinion.

The third requirement for mandamus relief, the absence of another adequate remedy, has also been established. " 'Mandamus will not be denied on the ground that there is another remedy unless such other remedy is equally convenient, beneficial and effective.' Syl. pt. 1, *Hardin v. Foglesong*, 117 W.Va. 544, 186 S.E. 308 (1936)." Syl. pt. 2, *Allen v. State Human Rights Commission*, 174 W.Va. 139, 324 S.E.2d 99 (1984) (and cases collected at 106 n. 5). *See also Graf v. Frame*, 177 W.Va. at 289–290, 352 S.E.2d at 39; *West Virginia Citizens Action Group, Inc. v. Daley*, 174 W.Va. 299, 302, 324 S.E.2d 713, 716 (1984); syl. pt. 4, *United Mine Workers v. Scott*, 173 W.Va. 356, 315 S.E.2d 614 (1984). In this regard, what this Court said in *Walls v. Miller*, 162 W.Va. 563, 565–67, 251 S.E.2d 491, 495–96 (1978), also involving a mandamus proceeding in which the Director of the then Department of Mines was a respondent, is true here too:

In this case the petitioner is not challenging one ruling by the Director concerning one particular safety problem in one isolated mine; to the contrary, he is challenging an entire philosophy of enforcement in which he alleges that the Director has completely misconstrued the requirements, purposes, and legislative intent of the three *W.Va.Code*, sections under review. Thus petitioner has formulated three broad legal issues which are not dependent for their resolution upon the type of detailed factual development which the administrative process envisages, but rather upon a broad interpretation of the manner in which certain sections of the mining laws should be enforced. The trend in this Court has been to enlarge the scope of mandamus, [citation omitted], especially where there is an urgent question of public policy or

where there is no reason for delaying adjudication of the issue by the highest court of the State. [footnote omitted]

... [W]e find in the case before us that the alleged deprivations of petitioner's rights are capable of being repeated under numerous variations of a basic recurring factual pattern, in spite of all other available administrative and legal remedies if no definitive resolutions of these issues are provided by this Court. [footnote omitted] Accordingly we hold that we have before us sufficient factual stipulations to permit us to adjudicate the three issues raised in the petition, and that there is no sound reason for declining to grant extraordinary relief. Furthermore, in this case we are not concerned with a mere point of law in routine civil litigation, but rather with the lives and limbs of countless thousands of living, breathing, human beings who, along with their families, have suffered needless loss since time out of mind in an industry which appears inevitably to suck the life's blood from the miner as he takes the coal from the earth. The Legislature intended that this needless suffering should stop, and it is our duty to effect the legislative purpose by such means as will best accomplish that end.

For the foregoing reasons we grant the writ of mandamus as moulded.

Writ granted as moulded.

NEELY and BROTHERTON, JJ., dissent and reserve the right to file dissenting opinions.

NEELY, Justice, dissenting:

I must respectfully dissent from the majority's holding in this case. *W.Va.Code* 22–6–1 [1985], which continues the existence of the Board of Coal Mine Health and Safety, provides in part:

(a)(2) Coal mining is highly specialized, technical and complex ...

(3) During each session of the Legislature, coal mine health and safety standards are proposed which require knowledge and comprehension of scientific and technical data related to coal mining ...

(4) The formulation of appropriate regulations and practices to improve health and safety and provide increased protections of miners can be accomplished more effectively by persons who have experience and competence in coal mining and coal mine health and safety.

As the language of the statute indicates, the legislature recognized that coal mining is a technical and complex enterprise. Accordingly, the promulgation and assessment of coal mine health and safety standards requires specialized technical expertise. The legislature does not possess such expertise, nor does this Court. The legislature has provided, therefore, for a panel of experts in coal mine health and safety to administer health and safety plans. *W.Va. Code* 22–6–1 *et seq.* Because the board and its director possess such expertise, the legislature endowed the director with substantial discretion in administering coal mine health and safety plans. *W.Va.Code* 22A–1A–4 [1985]; *Walls v. Miller*, 162 W.Va. 563, 251 S.E.2d 491, at 498–99 (1978).

The members of the board are required to evaluate complex technical and geological data pertaining to the roof conditions of individual mines and, in light of their expertise, to approve or disapprove of roof control plans proposed by the operators of individual mines. *W.Va.Code* 22–6–1, 22A–2–25(a). In light of the expertise and experience of the board in dealing with issues pertaining to roof control, this Court should be wary of overturning the considered decisions of the board on technical matters.

The evidence before us does not disclose the factors that must be considered in determining the adequacy of a roof control plan for a particular mine. However, even were we provided with a full record containing perfect information, we could not begin to comprehend its import. We simply do not have the requisite training to understand such a highly technical problem. Indeed, we are no more equipped to design or approve roof control plans than the average member of the board is to

decide an antitrust case. By stepping outside our sphere of competence, we merely expose our incompetence.

Moreover, what evidence there is before us is hardly conclusive. We have before us a plethora of affidavits from operators, miners, and mine safety experts averring that: (1) The conventional and combination roof support plans currently employed in various thin-seam auger mines around the state are adequately safe; (2) implementation of a blanket rule requiring full roof bolting in auger mines would in many cases not increase, and in some cases would decrease, the degree of safety in the mines; and (3) the cause of the fatalities listed in the petition was not the inadequacy of the roof control plan, but the failure to comply with the requirements of an approved plan or the failure to exercise extra precaution for adverse roof conditions as required by an approved plan. Because we are not technical experts, we are ill-equipped to assess the merits of these contentions. Accordingly, we should defer to the considered opinion of our expert board.

*W. Va. Code* 22A–2–25 [1985] is patterned after and is virtually identical to 30 U.S.C. 862(a) and (b) of the Federal Coal Mine Health and Safety Act of 1969. Pub.L. No. 91–173, 83 Stat. 766 (December 30, 1969). Federal regulations regarding roof control plans appear at 30 C.F.R. Part 75.200 *et seq.* These regulations are promulgated by the Mine Safety and Health Administration (MSHA), the federal analog to the West Virginia Board of Coal Mine Health and Safety. In addition to full roof bolting, the federal regulations recognize as adequate both conventional roof control plans, 30 C.F.R. 75.200–8, and combination roof control plans, 30 C.F.R. 75.200–9. There is nothing in the regulations to indicate that the MSHA believes full roof bolting is the only adequate means of roof support in thin-seam mines employing auger-type continuous coal mining equipment. Thus, after considering the available data, the federal government's panel of mine safety experts has corroborated the opinion of our board—full roof bolting is not the only adequate means of roof support in thin-seam mines employing auger mining techniques. In light of this federal corroboration, we should be even more wary of second-guessing the judgment of the board.

In the face of the conflicting evidence before us, and in spite of our lack of competence to consider this question, the majority rests its decision on a slender reed indeed. In West Virginia there are forty-four thin-seam mines employing auger mining techniques. Nine of these mines employ full roof bolting. The remaining thirty-five employ either conventional roof control or a combination roof control plan. Of these thirty-five mines, sixteen have experienced one roof fall casualty since 1974. None of these mines has experienced more than one roof fall casualty during this period. The remaining nineteen mines have experienced no roof fall casualties during the period.

The majority holds that the fact that casualties have not occurred in full-bolting mines while sixteen such casualties occurred in conventional or combination mines creates the "inescapable inference" that full-bolting is the superior method of roof control. Although the majority may be correct that full-bolting is the superior method, their inference is hardly inescapable. As I mentioned *supra,* evidence was submitted indicating that the casualties were caused not by flaws in the roof control plan, but by failure to adhere to the requirements of the plan. Neither the petitioners nor the majority make any showing that it was the lack of roof bolting which caused the casualties. Nor do they show how roof bolting would have prevented any of the casualties. Nor do the petitioners or the majority offer any explanation why nineteen mines in this State have operated without a single roof fall casualty in the last twelve years while employing either conventional or combination roof control plans.

Due to our lack of expertise, we simply do not know whether full roof bolting will prevent more miners from losing their lives. However, we *do* know that today's decision will cause more miners to lose their jobs. The majority opinion at p. 350 states:

We are aware of the concern of the coal operators that their economic interests are involved in this case. This Court will not, however, ignore the loss of life and limb in view of the fact that the statutes place the highest value on the health and safety of the miners.

Although such rhetoric possesses a certain populist appeal, it tells only half of the story. If operators forced to employ full roof bolting can no longer operate their mines, the mines will close and the miners will lose their jobs. At oral argument the courtroom was packed with non-union miners vehemently opposed to the prospect of full roof bolting.

It is implicit in the majority's opinion that *conclusive* evidence that full roof bolting is superior to other roof control plans is not necessary; all that is required for us to change current practice is evidence of a *possibility* that full roof bolting will make mines marginally safer. Yet requiring full roof bolting is not like adding one more footnote to an appellate opinion on the theory that even if it doesn't help, it can't hurt. The expense of a footnote never closed a court, but we had ample evidence at oral argument that full roof bolting will close many mines. Coal mining is, indeed, among America's most dangerous occupations and all reasonable efforts must be made to protect the health and safety of miners. But when our own health and safety board, the Federal Mine Safety and Health Administration, the coal operators, and, most important of all, the miners themselves have concluded, based on extensive experience, that mines without full roof bolts are as safe as those with them, we should not substitute our judgment for theirs.

I am authorized to say that BROTHERTON, J., joins me in this dissent.